MAXWELL, J.,
for the Court:
¶ 1. Amanda “Missy” Cleveland claimed she suffered physical and mental injuries from a filing cabinet falling on her at the apartment complex she managed. After-wards, she attempted suicide several times, was in and out of the emergency room, and eventually overdosed on drugs, dying at the age of forty-one. Cleveland’s mother, as administrator of Cleveland’s estate, sought workers’ compensation disability and death benefits, citing the supposed work accident as the cause. After sifting through evidence of Cleveland’s preexisting conditions, mental illness, drug and alcohol abuse, suicide attempts, and other unfortunate and tragic life circumstances, the administrative judge (AJ) and Mississippi Workers’ Compensation Commission (Commission) found Cleveland’s mental de-compensation and death were not linked to the claimed work injury. Because we find substantial evidence supports the Commission’s decision, we affirm the denial of disability and death benefits.
Procedural History
¶ 2. On April 15, 2000, a filing cabinet allegedly fell on Cleveland while she was managing apartments for Stonegate Apartments in Clinton, Mississippi. She filed for disability benefits with the Commission for a closed-head injury and mental injury. While her claim was pending, Cleveland died of a drug overdose. And her mother, Becky Hodges, pursued a workers’ compensation claim for Cleveland’s estate. Hodges later filed an amended petition to controvert, seeking death benefits for herself as Cleveland’s dependent.[1]
¶ 3. On July 12, 2006, a hearing was held at the Commission. Both the employer and carrier admitted a physical injury occurred on April 15, 2000. But they contested any physical impairment after April 18, 2000 — the date neurosurgeon Dr. Robert Smith found Cleveland reached maximum medical improvement. The employer and carrier also disputed liability for mental injury and resulting death.
*738 ¶ 4. The documentary evidence offered at the hearing was quite voluminous. Scores of records of Cleveland’s extensive medical history, both before and after the alleged work injury, were admitted. Depositions and/or medical records from at least twenty-five doctors and hospitals were also admitted, as were records from seven different pharmacies. Three lay witnesses and one expert witness testified live. And deposition testimony from four lay witnesses was offered.
¶ 5. After review, on November 1, 2006, the AJ entered an order denying disability and death benefits. The AJ found no credible evidence that the effects from the physical injury sustained on April 15, 2000, persisted after April 18, 2000. Nor did the AJ find a work-connected mental injury. She likewise found Cleveland’s August 14, 2001 death was neither a direct and natural consequence of any work-connected injury, nor related to the reported filing-cabinet injury. The full Commission affirmed the AJ’s order denying benefits. And on appeal, the circuit court affirmed the Commission’s denial.
¶ 6. Hodges has now appealed to this court.
Facts
1. The Filing-Cabinet Incident
¶ 7. Caron Downey was Cleveland’s assistant at Stonegate Apartments. She remembered Cleveland’s boyfriend, Ron Allen, being with Cleveland at work when the cabinet allegedly fell on her. She also recalled Cleveland was not scheduled to work that day.
¶ 8. Shortly before the claimed accident, Cleveland and Allen were in Cleveland’s office with the door closed for about fifteen minutes. Downey remembered Allen leaving Cleveland’s office and closing the door. Then, a few minutes later, Dow-ney heard a loud crash and scream. When she opened Cleveland’s door, she saw her on the floor. The filing cabinet was resting partially on Cleveland and on a bench. Downey lifted the cabinet so Cleveland could roll from under it. Though Downey did not see any cuts or bruises, Cleveland immediately asked her to contact Allen. When he arrived, an ambulance was called. Downey and Allen both followed the ambulance to Central Mississippi Medical Center (CMMC). Cleveland was treated and released but never returned to work at Stonegate Apartments.
2. Preexisting Conditions and Circumstances
¶ 9. Cleveland’s history of preexisting psychological issues is significant. Her mother and sister testified that Cleveland’s natural father sexually abused her between the ages of ten and thirteen. And Cleveland quit school in the ninth or tenth grade. At age seventeen, she married Allen Cleveland, and the two moved to California. ,
¶ 10. In 1979, after turning eighteen, Cleveland posed for Playboy as a centerfold model. Soon after, she divorced her husband,' and for the next ten years did promotional work for Playboy. Cleveland also appeared in several films, including “Blowout” and “Cheeeh and Chong — The Next Movie.” During her time in Los Angeles, Cleveland took pills, used cocaine, and attempted suicide twice.
¶ 11. After her stint in California, Cleveland moved to Montreal, Canada, and became celebrity Nanette Workman’s personal assistant. Four years later, in 1990, Cleveland moved back to Jackson, Mississippi, where she worked as a bartender, receptionist, leasing agent, and apartment manager. She became romantically involved with Keith Puckett, who was murdered in 1993. Medical records document her lingering grief from Puckett’s death.
*739 ¶ 12. In 1995, Cleveland married David White. But the couple divorced two years later. White described Cleveland’s drinking problems and use of Xanax and Valium. He claimed her drug and alcohol abuse caused their divorce. Her drinking led her to rehab, and at some point in their marriage, Cleveland asked White for methamphetamine. White suspected Cleveland was also using crack cocaine in the mid-1990s.
¶ 13. Other witnesses also described Cleveland’s past alcohol and drug addiction. Downey, the assistant apartment manager, knew Cleveland took Oxycodone and Lorcet and would ask residents for drugs. There was also testimony that Cleveland had overdosed on drugs in the 1980s.
3. Ron Allen
¶ 14. When Cleveland began working at Stonegate Apartments in 1995, she met Ron Allen. The two eventually moved in together at Stonegate. Allen was unemployed, apparently disabled from a back injury — an injury also purportedly caused by a filing cabinet falling on him.
¶ 15. Allen was described as controlling, dangerous, and abusive to Cleveland. According to Downey and another apartment resident, Diane Ratliff, Allen practiced “voodoo” and was “strange.” Allen had a notorious fondness for swords and knives, which adorned the walls of his apartment. And he was into what one of the women described as “chanting.” As Downey put it, Allen was a “creepy person” who “did everything in black.” Both women testified that Allen kept Cleveland secluded and drugged. . And Downy remembered Allen commenting that he would sue Stonegate Apartments and “own the place” someday. He had made similar comments to Ratliff about suing Stone-gate. Soon after Cleveland’s alleged April 2000 filing-cabinet injury, Allen obtained a general power of attorney over her.
¶ 16. Allen’s threatening behavior ultimately led to his eviction from Stonegate in May 2000.■ He and Cleveland then moved to a house in Yazoo City, Mississippi. The decor of his Delta home accentuated his dark persona — the walls were black, and one room apparently had a pentagram painted on the floor.
¶ 17. Cleveland remained with Allen in the Yazoo City house until her death on August 14, 2001. . That day, Allen reported finding Cleveland dead in the home. While no drugs were discovered in the home, the coroner listed Cleveland’s cause of death as “poly-pharmacy overdose.” But the coroner did not note if Cleveland died from accident, suicide, or homicide.
¶ 18. Allen also later died of a drug overdose.
Medical Evidence
1. American Medical Response (AMR) and CMMC Records
¶ 19. AMR records from April 15, 2000, show Cleveland was transported by ambulance to CMMC after the filing-cabinet incident. She was awake with normal vital signs, no obvious head trauma, and no neurological defects. Hospital records show Cleveland had no bumps or bruises. And a CT scan, MRI, and x-rays taken that day were normal.
2. Dr. Robert Smith, Neurosurgeon
¶20. Three days later, Dr. Smith saw Cleveland and found she had reached maximum medical improvement (MMI) physically. She had no bumps, bruises, or cuts. And again, a CT scan and x-ray were normal, though she did complain of loss of feeling in her right arm and revealed her depression from childhood sexual abuse. Because Dr. Smith found Cleveland’s work injury aggravated her preexisting depres *740 sion from sexual abuse, he referred Cleveland to a psychiatrist. But Dr. Smith was under the impression Cleveland was employed and stable before but not after the injury. Dr. Smith later admitted he did not have Cleveland’s complete medical records when diagnosing her. So his assessment was solely from the history she provided him.
3. Dr. Ahmed Raza, Psychiatrist
¶ 21. Dr. Raza saw Cleveland on April 19, 2000, and diagnosed her with a possible somatoform disorder. He later diagnosed her with factitious disorder and found no impairment from a work-connected injury.
4. Dr. Michael Osborne, Head and Neck Surgeon
¶ 22. Dr. Osborne saw Cleveland on May 10, 2000. Allen was with her during the visit, and he, not Cleveland, provided all of Cleveland’s history and answered all questions posed to her. According to Dr. Osborne, Cleveland never spoke a word, and it appeared to Dr. Osborne that she was intimidated by Allen. When asked if Allen controlled Cleveland, Dr. Osborne said: “Absolutely, without a doubt. Psychologically, he had complete control over her.” He also remembered Cleveland had an open, weeping, and likely infected second-degree burn from the inside of her wrist to her elbow. So he referred Cleveland to a plastic surgeon for her arm. Dr. Osborne saw no evidence of an injury to her head or neck and no impairment attributable to a work-connected injury.
5. Dr. Billy Fox, Psychologist
¶ 23. On May 23, 2000, Cleveland was admitted hr CMMC for depression and a self-inflicted burn. Drs. Fox and Raza treated her. Both doctors diagnosed Cleveland with factitious disorder. Dr. Fox’s psychological and neuropsychological testing corroborated the factitious disorder.[2] He found Cleveland was under-reporting cognitive abilities and over-reporting psychological symptoms. Dr. Fox felt more investigation was needed to rule out malingering. Dr. Fox found no impairment attributable to a work-connected injury.
6.Dr. Mario Pineda, Psychiatrist
¶ 24. Dr. Pineda saw Cleveland on June 7, 2000. Allen was with her, and he did all of the talking. Allen maintained that Cleveland became depressed and suffered seizures after the filing-cabinet episode. Dr. Pineda initially diagnosed Cleveland with major depression secondary to post-concussion syndrome. When Dr. Pineda next saw Cleveland on June 21, 2000, she reported having hallucinations and being suicidal. He diagnosed her with severe depression and psychosis.
¶ 25. Seven days later, Cleveland was readmitted to St. Dominic for various complaints. Though she denied any drug or alcohol abuse, she tested positive for barbiturates, benzodiazepines, marijuana, and opiates. During a visit on July 6, 2000, Cleveland told Dr. Pineda about her childhood sexual abuse. And on July 25, 2000, she told him about her continuing grief from her boyfriend being murdered in 1993. Two weeks later, Cleveland reported to Dr. Pineda that she was depressed and thought about killing herself.
¶ 26. On September 28, 2000, Cleveland told Dr. Pineda she had tried to kill herself with a knife. The next day, she was readmitted to the hospital for attempted sui *741 cide and homicide, claiming she had cut herself and Allen with glass and was hearing voices. Dr. Pineda believed her depression resulted from a closed-head injury from the filing-cabinet incident. Dr. Pineda saw Cleveland several more times, but eventually refused to see her because Allen continuously interfered with her treatment. Allen had also threatened to hurt Dr. Pineda and his staff.
¶ 27. Dr. Pineda concluded Cleveland’s hospital admissions and suicide attempts were directly related to the work accident. He also believed she never reached MMI and was totally disabled. Despite the fact that Cleveland was medicated during QEEG testing,[3] Dr. Pineda found the QEEG findings showed she had suffered a brain injury. But Dr. Pineda did admit not having any of Cleveland’s medical records from other doctors when treating and diagnosing her.
7.King’s Daughter’s Hospital Records
¶ 28. On October 11, 2000, Cleveland was admitted to the hospital with multiple bruises, lacerations, abrasions, and a split lip. She also had bite marks on her buttocks. Cleveland tested positive for benzodiazepines, opiates, and tricyclics. She was transferred to the University of Mississippi Medical Center (UMMC) by helicopter and diagnosed and treated for presumptive domestic violence. These records show Hodges reported Cleveland’s long history of drug and alcohol abuse. And they describe Hodges’s concerns that Allen was giving her drugs.
8. St. Dominic Records
¶29. On January 8, 2001, Cleveland was admitted to St. Dominic for a suicide attempt after trying to hang herself. Cleveland told a nurse that Allen physically abused her, tried to kill her in the past, and had overdosed her on drugs.
9. Dr. Phillip Scurria, Psychiatrist
¶ 30. Dr. Scurria saw Cleveland and Allen on March 7, 2001. He diagnosed her with mood and personality changes secondary to brain injury. His notes show Cleveland began to self-mutilate by cutting herself. Like Dr. Pineda, Dr. Scurria did not have any of Cleveland’s prior medical records for review.
10. Dr. Stanley Russell, Psychiatrist
¶ 31. Dr. Russell began treating Cleveland on April 17, 2001. He diagnosed her with organic mood disorder, with some psychotic features. He thought Cleveland’s depression directly related to the supposed work injury. And he opined she had not reached MMI and was totally disabled, and that her closed-head injury significantly contributed to her death from the drug overdose. Dr. Russell admitted not having many of Cleveland’s medical records when treating and diagnosing her. And he conceded there was no objective evidence of a closed-head injury or impairment. Instead, his finding of impairment was based on his presumption she was employed and functioning before but not after the injury.
11. Dr. Mark Webb, Psychiatrist
¶ 32. Dr. Webb performed a records review and concluded Cleveland had not *742 been completely honest with any of her doctors. Dr. Webb did not believe she had ' any psychiatric illness from a work injury. And he found no impairment attributable to a work-connected injury.
12. Dr. David Cantor, Psychologist
¶ 33. Dr. Cantor discounted Dr. Pine-da’s opinion that Cleveland had a brain injury that caused her mental decomposition. According to Dr. Cantor, Dr. Pine-da’s findings were unsupported. He emphasized that Dr. Pineda had neither an accurate nor a comprehensive history from Cleveland. And as Dr. Cantor saw it, a diagnosis of a brain injury could not be made without a proper history.
¶ 34. Dr. Cantor also felt Dr. Pineda’s reliance on Cleveland’s QEEG results was unfounded. He flagged the test results as invalid since Cleveland was medicated during testing. Dr. Cantor concluded Cleveland’s depression and anxiety were more likely attributable to her preexisting issues combined with substance abuse and the psychological stress of a physically abusive and emotionally controlling boyfriend. He found no impairment attributable to a work-connected injury.
Discussion
A.Standard of Review
¶ 35. Appellate review of workers’ compensation claims is limited. Daniels v. Peco Foods of Miss., Inc., 980 So.2d 360, 363 (¶ 8) (Miss.Ct.App.2008). The Commission is the ultimate fact-finder and may accept or reject an AJ’s findings. Hardin’s Bakeries v. Harrell, 566 So.2d 1261, 1264 (Miss.1990). If the Commission’s factual findings are supported by substantial evidence, we may not disturb them. Id. (citing R.C. Petroleum, Inc. v. Hernandez, 555 So.2d 1017, 1021 (Miss.1990)). Substantial evidence is “such relevant evidence as reasonable minds might accept as adequate to support a conclusion.” Imperial Palace of Miss., LLC v. Ryan, 113 So.3d 630, 632 (¶ 10) (Miss.Ct.App.2013) (quoting Kukor v. Ne. Tree Serv., Inc., 77 So.3d 1134,1136 (¶ 7) (Miss.Ct.App.2011)).
B. The Evidentiary Review and Findings
¶ 36. Hodges argues the AJ’s and the Commission’s conclusions were not supported by substantial evidence. While she understands there was conflicting medical testimony and evidence, she insists the more favorable findings of her daughter’s treating physicians should have been given greater weight than the other physicians’ opinions. We disagree, and point out we have previously expressly rejected this same argument. See Daniels, 980 So.2d at 365 (¶ 15) (rejecting argument that testimony of treating physicians must be given credence over employer’s examining physicians). No matter the doctor’s relationship to the patient, when there is conflicting medical evidence, it is the Commission’s job as the ultimate fact-finder to sift through the competing evidence and place whatever weight it deems appropriate on the medical testimony and evidence. Imperial Palace, 113 So.3d at 632 (¶ 11) (citing Smith v. Tronox, LLC, 76 So.3d 774, 780 (¶ 23) (Miss.Ct.App.2011)). Once this is done, and a decision about compens-ability is made, if substantial evidence supports the Commission’s decision, we must affirm.
C. Mental-Injury Requirements
¶ 37. In a general physical-injury-based workers’ compensation benefits case, a claimant must prove “(1) an accidental injury; (2) arising out of and in the course of employment; and (3) a causal connection between the injury and the claimed disability.” Id.' at (¶ 13). But when the claim involves a mental injury, there is an additional requirement. To *743 recover for “a mental injury after a physical injury, a claimant must prove that the disabling mental injury ‘was caused, contributed to, or aggravated by a work-related physical injury.’” Daniels, 980 So.2d at 368 (¶ 10) (quoting Kirk v. K-Mart Corp., 838 So.2d 1007,1010 (¶ 17) (Miss.Ct.App.2003)). This requires that the claimant prove, by clear evidence, a causal connection between the mental injury and the physical work injury. Id. at 365 (¶ 17).
D. The Decision
¶ 38. After considering the conflicting evidence, the AJ felt Drs. Russell, Pineda, and Scurria were not credible. The AJ was skeptical of their findings since each had relied on incomplete and inaccurate histories of Cleveland’s pre-morbid and co-morbid psychological conditions and diagnoses of her. None of these three physicians had Cleveland’s complete medical records, which the other reviewing doctors found were necessary to determine the true course of treatment and depth of pathology. And their opinions conflicted with diagnostic test results and objective medical findings in the record.
¶ 39. A prominent inconsistency was the fact that all CT scans, MRIs, and x-rays of Cleveland’s head and brain were negative. Also, there was medical testimony disputing the QEEG results as invalid since Cleveland was sedated by medication during testing. And these three doctors’ opinions conflicted with first-responder and medical-personnel records, showing Cleveland had no cuts, bruises, or abrasions after the claimed accident.
¶ 40. The AJ was instead swayed by the opinions of Drs. Raza, Fox, Osborne, Cantor, and Webb — all of whom found Cleveland had no impairment from a work-connected injury/ The AJ noted Drs. Raza, Fox, and Osborne had treated Cleveland closer in time to the injury than Drs. Pineda or Russell. And the AJ put credence in Dr. Fox’s testing, which corroborated his diagnosis of “factitious disorder or malingering.”[4] Greater weight was given to Dr. Cantor’s and Dr. Webb’s views of Cleveland’s issues, since both doctors had more complete medical records than Drs. Pineda and Russell — something we cannot fault the AJ for doing.
¶ 41. Overall, the AJ found the opinions of Drs. Raza, Fox, and Cantor were more consistent with the competent medical evidence and more believable when considered against the backdrop of the entire sad sequence of events. As the AJ pointed out, the record painted a tragic picture of Cleveland, who was controlled, manipulated, and abused — both physically and psychologically — by Allen. Thus, in the end, the AJ found that, though Cleveland de-compensated after April 15, 2000, the de-compensation was caused by preexisting psychological issues, which led to her increasing dependence on a destructive personal relationship with Allen and substance abuse. Considering the conflicting testimony over whether Cleveland’s mental injury or death was caused, contributed to, or aggravated by a work-related physical-injury, the Commission adopted the AJ’s findings of fact.
¶ 42. As mentioned, we reject Cleveland’s urging that her treating physicians’ opinions must be given greater weight than the employer’s examining physicians. See Daniels, 980 So.2d at 365 (¶ 16). This is particularly true here, since her treating doctors, Russell, Pineda, and Scurria, admittedly lacked complete medi *744 cal records and proper medical histories of her lengthy drug, alcohol, sexual, psychological, and physical abuse. Our supreme court has emphasized: “When an expert’s opinion is based upon an inadequate or incomplete examination, that opinion does not carry as much weight and has little or no probative value when compared with the opinion of an expert that has made a thorough and adequate examination.” Johnson v. Ferguson, 435 So.2d 1191, 1195 (Miss.1983). And here, the AJ and Commission found the more thorough and complete medical evaluations, objective evidence, and Cleveland’s life circumstances cut against her claim.
¶ 43. We also find no support for Hodges’s insistence that Dr. Webb’s opinion should count less than those of her treating physicians, since he examined Cleveland just once. That a doctor examines a patient one time does not itself render his or her examination inadequate or incomplete. DiGrazia v. Park Place Entm’t, 914 So.2d 1232, 1237 (¶ 12) (Miss.Ct.App.2005). Nor does the fact that a doctor or several doctors examined a claimant more frequently than another doctor, standing alone, render the less-visited doctor’s findings inadequate. Id. With this said, we are mindful that Dr. Webb was just one of four doctors who found no causal connection between the work incident and claimed injuries.
¶ 44. This is an unusual and incredibly tragic case, but it is one where there is overwhelming evidence supporting the Commission’s decision that Cleveland’s mental decompensation was from preexisting psychological issues. And it was those issues — not the alleged filing-cabinet injury — that led to Cleveland’s increased dependence on a destructive relationship with Allen and substance abuse. Because there is substantial evidence supporting the Commission’s denial of disability and death benefits, we must affirm.
¶ 45. THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, ROBERTS, CARLTON, FAIR AND JAMES, JJ., CONCUR.

. See Miss.Code Ann. § 71-3-25 (Rev.2011).

. Dr. Fox explained that factitious disorder is when a person over-reports or under-reports symptoms and plays a sick role.

. Dr. Pineda explained that QEEG testing is neurofeedback dealing with brain waves: “[I]t is the use of electronic devices ... to detect a signal from our body that ... we would not be aware [of]. And by displaying the signals in a way that we can see or hear facilitates a learning process to control those bodily signals [that] are responsible for symptoms and problems and illnesses.”

. Hodges argues that the AJ improperly equated a diagnosis of factitious disorder with malingering. We disagree. Dr. Fox's diagnosis was factitious disorder, and he clearly said . that further investigation was needed to rule ■ out malingering.